## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN JEFFREY SWEDA : CIVIL ACTION
  :
      Plaintiff : NO:
  :
   vs. : *Electronically filed*
  :
UPPER BUCKS COUNTY :
TECHNICAL SCHOOL and MEGAN :
BANIS-CLEMENS, in her official :
Capacity of Chair of the Joint Operating :
Committee of Upper Bucks County :
Technical School :

      Defendants : JURY TRIAL DEMANDED

## COMPLAINT
## FEDERAL JURISDCTION

1.    This Court has original subject matter jurisdiction of this case under 28 U.S.C.

§§1331 because this action arises under the laws of the United States, specifically the Civil

Rights Act of 1871, 42 U.S.C. §1983.

2.    Venue is proper in the Eastern District of Pennsylvania because defendant has its

principal place of business in Bucks County and a substantial part of the events or omissions that

give rise to the claim occurred in this district.

## ALLEGATIONS OF FACTS

3.    Plaintiff is John Sweda, who lives at 1109 South Providence Road, Hazle

Township, Pennsylvania, 18202 in Luzerne County, Pennsylvania.

4.    Defendant Upper Bucks County Technical School is located at 3115 Ridge Road,

Perkasie, Pennsylvania.

5.      The UBCTS is a technical school run by a Joint Operation Committee (JOC), which is comprised of School Board members sent from the following feeder school districts: PennRidge, Palisades, and Quakertown.

6.      The Joint Operating Committee is, in effect, a School Board, and the abbreviation "JOC" or the word Board is used herein to collectively refer to its members.

7.      Miss Megan Banis-Clemens, at the time of this Complaint, was a resident of Bucks County and  was Vice Chairman of the JOC during the period of the facts alleged in this Complaint until as of December 16, 2021, at which point she became Chair of the JOC at the Board's reorganization meeting.

8.      Plaintiff is the former Administrative Director of UBCTS.  As Administrative Director, Plaintiff's duty was to direct the functions of the school in accordance with the policies established by the JOC.

9.      Plaintiff reported to a Superintendent of Record, Bridgette O'Connell. Plaintiff had no responsibility to develop policy, which was the responsibility of the JOC. Plaintiff's job duties consisted of planning, organizing, directing and evaluating the total educational and administrative functions of the secondary and adult education programs, and any other programs authorized by the Joint Operating Committee. He was responsible for general supervision of all administrative, supervisory, instructional and support staff.

10.     Plaintiff was fired on or about April 20, 2022.

11.     Defendant UBCTS, by and through a vote of its Joint Operation Committee ("JOC"), fired Petitioner citing a variety of differing reasons under Section 1122 of the School Code, 24 Pa.C.S. section 11-1122.

2

12.     The vote was 8-1, with the immediate past Board Chairman, James Hallowell, dissenting.

13.     Mr. Sweda is a tenured administrator with a long history of teaching and 23 years of service in technical schools.

14.     He received a three-year contract renewal in July, 2021.

15.     Mr. Sweda served in his role as Executive Director for UBCTS in exemplary fashion for three years and received regular raises.

16.     Mr. Sweda's evaluations were excellent. He met all goals set for him and received incentive compensation as a result.

17.     There was no reason to think he had poor performance issue until the retaliatory events described in this Complaint.

18.     Mr. Sweda received no written reprimands.

19.     There were not even private meetings indicating concerns with any aspect of his performance.

20.     Plaintiff was terminated because Defendants perceived that he would not ascribe to their political beliefs regarding allowing parents to opt out of the government mask mandate, and because he refused to participate in defendants' fraudulent scheme to take taxpayer money while lying about implementation of the government mask mandate, and because he reported Defendants' unlawful conduct to the relevant authorities.

21.     A Local Education Agency ("LEA") is a local school, which in the present law suit is Defendant UBCTS.

22.     A State Education Association ("SEA") is a state's department of education, which in this case is the Pennsylvania Department of Education ("PDE").

3

23.     The ARP Act and U.S. Department of Education rules require LEAs receiving ARP ESSER Funding to develop Health and Safety Plans that adopt CDC recommendations, including the universal and correct wearing of masks.

24.     Each LEA that receives ARP funding is obligated to submit its Plan to its SEA.

25.     By July 30, 2022, LEAs that receive federal Title-I funds in FY 2020-2021 and that intend to apply for and receive ARP ESSER funds must develop, submit to the SEA on a reasonable timeline determine by the SEA, and make publicly available on the LEA's website a plan for the use of ARP ESSER funds.

26.     Accordingly, UBCTS had the obligation to develop, post and submit a Health and Safety Plan and associated URL to PDE.

27.     Under Federal requirements, the preparation of the foregoing is the mechanism for SEAs and the U.S. Department of Education to make sure ARP ESSER funds are being used consistent with statutory requirements and to meet the needs of schools, students, and educators, and in particular those students most impacted by the Covid-19 pandemic.

28.     Ninety percent (90%) of ARP ESSER funds provided under this program to an SEA is supposed to be passed through to LEAs.

29.     The LEA is obligated under federal regulations, inter alia, in the Health and Safety Plan, to the greatest extent practicable, to support prevention and mitigation policies in line with the most up-to-date guidance from the Centers for Disease Control and Prevention (CDC) for the reopening of school facilities in order to continuously and safely open and operate schools for in-person learning.  See Federal Register Volume 86, No. 76 at 20199-20200 (April 21, 2021).

4

30.    The Health and Safety Plan under federal regulations will explain how the LEA will maintain the health and safety of students, educators, and other staff, and the extent to which is has adopted policies, and a description of any such policy on each of the following safety recommendation established by the CDC:

  a.    Universal and correct wearing of masks;

  b.    Modifying facilities to allow for physical distancing;

  c.    Handwashing and respiratory etiquette;

  d.    Cleaning and maintaining healthy facilities, including improving ventilation;

  e.    Contact tracing in combination with isolation and quarantine, in collaboration with State and local health departments;

  f.    Diagnostic and screening testing;

  g.    Efforts to provide vaccinations to school communities;

  h.    Appropriate accommodation for children with disabilities with respect to health and safety policies; and

31.    UBCTS had been operating under a Safety Plan pursuant to this requirement for some time before August of 2021.

32.    On August 15, 2021, as Executive Director, Jeff Sweda, sent out a letter to the families of UBCTS students announcing that the school would be reopened as mask optional, which was the then current state of state requirements.

33.    On August 17, 2021, there was recommendations from the Bucks County Health Department to follow CDC guidelines to have masking in Schools.

34.    On August 17, the UBCTS Health and Safety Plan was revised by Mr. Sweda to require masks of August 30th.

35.     On August 19, 2021, the JOC met in a regular and advertised meeting at which time the UBCTS Board voted not to accept the change in the Health and Safety Plan to include indoor masking in an 8-1 vote, Board Chair Hallowell dissenting.

36.     On August 29, 2021, the Bucks County Board of Commissioners wrote a letter to all Bucks County School District Members recommending the 2021-2022 school year begin with mandatory masking for students.

37.     On August 31, 2021, the Pennsylvania Acting Secretary of Health signed an Order requiring face coverings to be worn in all school entities.

38.     The Secretary of Health's Order was communicated to School Districts, including but not limited to warnings concerning the Order from the Pennsylvania Department of Education.

39.     UBCTS JOC Vice Chair Banis-Clemens, a member from Pennridge's School Board, objected to students wearing masks or shields in the schools, and asserted that that the current state of the Covid-19 law was that parents can sign off for their children not to wear masks at school.  This was not a correct statement of the law but rather was a political belief that Banis-Clemens had adopted and was promulgating in an effort to win favor with voters.  Banis-Clemens was a leader of a political faction which believed in defying COVID-19 mitigation orders from the administration of Democratic Party Governor Tom Wolf as well as the CDC.

40.     Then JOC Vice Chair Ms. Banis-Clemens was at the time and is an ideologue on the issues of vaccinations and masks.

41.     On September 2, 2021, Pennridge District, led by Banis-Clemens, informed through its web site that the Governor and the Secretary of Health's Order was against the wishes of the majority of Pennridge residents and informed that it was the Board's belief that their

6

school should be locally controlled.  See

https://www.pennridge.org/site/default.aspx?PageType=3&ModuleInstanceID=2931&ViewID=7
b97f7ed-8e5e-4120-848f-a8b4987d588f&RenderLoc=0&FlexDataID=5925&PageID=1794

42.     The Pennridge District proclaimed that Parents were the best judge of their
children's well-being.  Id.

43.     The Pennridge District stated school policy was that students could attend school
if a parent signed an exemption form that indicated the child had a health reason not to wear a
mask and that the parent that did not need a doctor's note or supporting medical documentation.
Id.

44.     This became known in public parlance as the "Pennridge model" or "Pennridge
option."

45.     Ms. Banis-Clemens was a spokesperson and key political player in her home
district, Pennridge, on issues related to Covid-19 skepticism, promoting a novel and unlawful
exemption for "moral objections" to vaccination (as opposed to the legal  one, bona fide religious
objections), and as well as the foregoing Pennridge option on masks.  See
https://patch.com/pennsylvania/doylestown/bucks-co-district-grant-moral-exemptions-vaccine-
mandates.

46.     The past requirement at UBCTS, following PDE and CDC guidelines, had been if
masks were required, a doctor would have to certify there was a physical or mental reason for a
student to obtain an exemption not to wear a mask.  In that circumstance, the student would have
to wear a face shield.

47.     Ms. Banis-Clemens proceeded to lobby fellow members of the JOC to have a
parent "sign off" option for their student children not to have masks or face shields.

48.     There was no requirement in the Banis-Clemens proposal for a licensed medical professional to approve or recommend the waiver of masks or face shields.

49.     Concerned that the JOC was going to violate the law, harm the interest of disabled students who were particularly vulnerable to COVID-19 infection, and jeopardize federal school funding, Plaintiff wrote to the Department of Education to clarify whether the JOC could approve a policy that the parents of UBCTS students could, without medical input, sign a waiver that would allow their child to attend UBCTS without a mask or shield.

50.     Ms. Banis-Clemens was incensed at Plaintiff's communication to PDE.

51.     On or about September 4, 2021, Mr. Sweda was ordered by JOC Vice Chairman Banis-Clemens under the signature of Board Chairman James Hallowell, her signature, and Treasurer  Christopher Spear to send out a letter saying that the UBCTS policy was to allow parents to decide whether their children should wear masks or face shields.

52.     Mr. Hallowell did not support the letter being sent out and later objected to the use of his name on it.

53.     This action was taken not at a regularly scheduled school board meeting that had been advertised, but at a secret unadvertised closed-door meeting of two members of the Executive Committee.

54.     Ms. Banis-Clemens instructed Mr. Sweda to issue the Pennridge model at UBCTS, claiming she had the authority of the executive committee to do so.

55.     The Board Chair, a member of the Executive Committee of three persons, was not consulted on her instruction.

56.     Plaintiff objected he could not do this and this action was not being taken at a regular School Board meeting.

57.     The UBCTS Solicitor David Conn was consulted.

58.     UBCTS Solicitor David Conn opposed the letter being sent out for a variety of reasons, in a group e-mail, which included it was not done at a public meeting and Banis-Clemens  needed five (5) votes but saying that the letter could go out if five votes were communicated to him or Plaintiff.

59.     Plaintiff made several versions of letters to try to get the Board send out a letter that met CDC and PDE guidelines.

60.     Ms. Banis-Clemens communicated her opposition to each draft and eventually sent in her wording in the letter to publish.

61.     Only five (5) members voted to send out the letter, all in favor, and the other Board members did not respond.

62.     Plaintiff's position that he communicated to JOC members at the time was that he thought UBCTS should follow CDC and PDE guidelines, this was required given the state of the known government requirements, that compliance with CDC and PDE guidelines had been kept the school safe as a result of prior compliance, and 178 days of 180 required days of face-to-face instruction had been completed with very low incidence of infection of students and staff.

63.     Plaintiff indicated that there were legal liability issues and raised liability concerns for the JOC members individually and Plaintiff.

64.     Five Board members communicated to Plaintiff approval of the letter.

65.     Plaintiff sent out the letter as per the Solicitor's advice that it could be sent out.

66.     At some time after September 8, 2021, Plaintiff was sent a harshly worded letter that was circulated privately among School Superintendents and Administrator  by Acting Secretary of Education Noe Ortega to a different Pennsylvania School District demanding

compliance with face covering requirements and accusing the involved district of "flagrantly violating" the Secretary of Health's August 31ˢᵗ Order.

67.     Secretary Ortega's letter bluntly told the involved District that the Secretary of Health's Order regarding masks was not optional.

68.     The letter threatened legal action and significant legal repercussions for schools that violated Secretary of Health's face covering Order, including exposure to personal liability under Section 8550 (Willful Misconduct) of Pennsylvania's immunity statute and imposition of the penalties under the Prevention and Disease Control Law of 1955.

69.     This letter and the Pennsylvania Department of Education's web site formed a basis for significant interaction among Plaintiff and other Superintendents and Administrators as to what position, if any, should be taken contrary to the will of a School Board that was responding to Board ideological pressure or political pressure from constituents to, in effect, make masks optional in defiance of the law.

70.     This was a topic of concern and a matter of private discussion among a number of Superintendents and Administrators.

71.     At some time in early or mid-September, which Plaintiff believes is on or about September 12th, he also received a communication from the Sherri L. Smith, Ed.D., Acting Deputy Secretary Department of Education; Office of Elementary and Secondary Education.

72.     This was an official communication sent to administrators throughout Pennsylvania.

73.     The text of the communication, which Plaintiff saved, indicates as follows in regards to the Governor and Secretary of Health's Order on masks in Schools:

> Relatedly, this Order is not a mask optional policy. Any school entity simply permitting a parent's sign-off without evidence that the student has a medical or

mental health condition or disability that precludes the wearing of a face covering is not in compliance with the Order. Under the Order, and as set forth in PDE's Answers to FAQs, school entities must require all individuals, two years of age and older, to wear face coverings unless the individual has a medical or mental health condition or disability that precludes the wearing of a face covering. In accordance with Section 3 of the Order, before an individual is excepted from the Order, all alternatives to a face covering, including a face shield, are to be exhausted. It is recommended that any exception be in accordance with eligibility under Section 504 of the Rehabilitation Act or IDEA for such medical or mental health condition or disability. School entities should follow their established processes for determining student eligibility under those laws, including any medical documentation that they would normally require. There are exceptions to the Order; however, a parent's opposition to the Order is not one of them.

74.     Webinar(s) were held for Administrators by Ms. Smith and the Pennsylvania Department of Education during this time period on the Governor's Order which reiterated clearly this mandatory requirement and a duty to report.

75.     On September 16, 2021, the UBCTS JOC held its regular September Board meeting.

76.     Mr. Sweda issued the following letter to the Board, which he believes he gave in advance:

> It is my recommendation on this day September 16, 2021 as the Executive Director of the Upper Bucks County Technical School to follow and enforce the Pennsylvania's Acting Secretary of Health Order requiring face coverings to be worn in all school entities. The Order went into effect 12:01 AM on Tuesday, September 7, 2021, and will remain in effect until the Acting Secretary of Health determines the public health risk is sufficiently reduced so that face coverings are no longer necessary as public health tools in school entities.
>
> This Order is not a mask optional policy. Any school entity simply permitting a parent's sign-off without evidence that the student has a medical or mental health condition or disability that precludes the wearing of a face covering is not in compliance with the Order.
>
> School officials who fail to adhere to the order could lose the protection of sovereign immunity and may personally face lawsuits from those who may be affected by any official's attempt to ignore the order. Failing to implement or follow the control measures may expose individuals to personal liability under 42 Pa.C.S § 8550 (relating to

willful misconduct), as well as other remedies as provided by law. Failure to implement and follow the control measures under the Order also subjects a person to the penalty provisions of the Disease Prevention and Control Law of 1955.

The Order, issued under the Disease Prevention and Control Law, establishes a legal mandate. School entities are expected to enforce the Order as they do other state laws and school rules and policies. Reasonable steps may include developing and implementing a policy, enforcing already existing policies, training staff on conflict management, and monitoring and taking corrective actions in instances of noncompliance among staff, students, or visitors. School entities should follow their local policies and procedures on managing student and staff misconduct.

Schools should make available mitigation strategies and accommodations for each student who meets one or more of the exceptions in Section 3 of the Order. If such a student is unable to use a face covering, the following steps will be taken:

Collaborate with student's parent/guardian and healthcare provider, a certified school nurse, and school administrators to develop an appropriate educational plan of care for the student (should use 504, IEP, or ECP when appropriate).

The safety and well-being of my 837 Students, 24 Faculty members, and 60 staff members are paramount.

77.     At the Board meeting on September 16, 2022, Ms. Banis-Clemens made a Motion to allow parents, and not medical professionals, to sign off that their child had a medical need not to wear masks.

78.     This was in violation of PDE and CDC requirements.

79.     Sweda opposed this policy verbally when it came up before the Board and gave them the appropriate advice to follow CDC guidelines and PDE requirements.

80.     Mr. Sweda reiterated to the JOC that the Pennsylvania Department of Education had told the JOC to follow CDC guidelines.

81.     Solicitor David Conn indicated the JOC was voting on the Pennridge model, an exemption that would be attested by the parent or guardian.

82.     Mr. Sweda asked the Board to reconsider its proposed direction.

12

83.     In a 6-3 vote, the JOC passed Ms. Banis-Clemens' Motion and allowed parents to sign off that their children masks were medically necessary without a doctor's note.

84.     The then Board Chair Hallowell was one of the three dissenting votes.

85.     The Board subsequently, in the same meeting, chose to amend the UBCTS Safety Plan to allow parents to approve their children to come to school without masks.

86.     The JOC's decision to accept the "Pennridge option" was a fraudulent scheme to avoid the law and circumvent a comprehensive Health and Safety Plan that would allow CDC guidelines to the fullest extent possible and included masks but also include other items that were federally funded.  If the JOC had been honest and forthright in asserting that it was rejecting the state and federal mask requirements it would not have been eligible for federal funding. Therefore, the JOC chose to be deceptive and claim that parents who chose to opt their children out of the mask requirement were doing so for valid medical reasons even though the JOC knew that that was not the case.

87.     This decision placed all students, the faculty, and in particular, students and faculty with medical conditions that are susceptible to Covid-19 that qualify for protection under relevant law at risk, as well as the public at large.

88.     The JOC at no time  on behalf of UBCTS stopped receiving Covid-19 federal funding or offered to return it as a result of asserting their political principles regarding masks.

89.     Subsequently, parents of thirty-eight percent of the UBCTS students followed this deceptive and dangerous procedure, and as a result, Covid-19 cases in UBCTS got dramatically worse.

90.     At the time, the proposed policy put at risk ARP ESSER and potentially other funding for Covid-19 remediation and raised the potential of a "claw back."

91.     Ms. Banis-Clemens was incensed at Plaintiff's action in rejecting her political position regarding not following state and federal mask requirements.

92.     On November 8, 2021, a disgruntled recently resigned employee, Bill Gerhard, in a letter largely devoted to explain why his performance was inadequate, made a number of trivial or false complaints about Mr. Sweda with the primary goal of showing Sweda did not always follow procedure either.

93.     These complaints were not investigated by Human Resources.

94.     The UBCTS Superintendent of Record, Dr. Bridgette O'Connell was not consulted on the proposed investigation of Plaintiff .

95.     Ms. Banis-Clemens went around Board Chair Hallowell's back outside a regularly scheduled meeting to propose investigating Mr. Sweda without the input of UBCTS Human Resources or the professional staff, including Dr. O'Connell.

96.     Ms. Banis-Clemens suggested hiring the Pennridge Solicitor as investigating legal counsel.

97.     On November 8, 2021, Mr. Sweda was suspended without prior notice or warning largely at Banis-Clemens' instigation.

98.     Legal counsel closely associated with the Pennridge district were engaged to investigate Mr. Sweda.

99.     A five-week investigation ensued.

100.    Plaintiff voluntarily met with an investigating team from the involved law firm.

101.    Plaintiff's counsel asked for all items that would be raised at the meeting but such a request was denied by investigating counsel.

102.    This culminated in UBCTS asking Mr. Sweda direct questions that seemed to have private information that would lead to the conclusion a sexual affair between him and a female teacher, which he denied.  These allegations had nothing to do with Gerhard's charge.

103.    Plaintiff was surprised by being asked about several other items not among Gerhard' complaints, including false allegation that he was having an affair with a UBCTS teacher.

104.    The original items claimed as issues with Sweda by Gerhard were expanded to several other claims.

105.    In December, 2021, there was a regularly scheduled JOC reorganization.

106.    Four new Board members came off the Board as four members rotated off the JOC.

107.    Four Board members who voted in favor of Ms. Banis-Clemens "Pennridge Option" proposal remained on the Board.

108.    At reorganization, Ms. Banis-Clemens became Chair of the JOC.

109.    The only member who voted to comply with CDC and PDE guidelines who remained on the JOC, was former it Chair, Mr. Hallowell.

110.    In late December, 2021, Plaintiff was sent a Statement of Charges in advance of a Meeting to vote on whether to move forward with a termination proceeding under Section 1122.

111.    Plaintiff's pay and benefits was unilaterally cut off without a vote of the Board.

112.    In advance of the hearing, Plaintiff's counsel sent correspondence and then a Motion to investigating counsel and UBCTS Solicitor Conn asking for a private hearing under Section 1126 of the School Code and warning that publication of the charges would potentially poison the atmosphere for a fair hearing.

113.    The Motion asked also for reinstatement of pay and benefits as required by precedent pending the outcome of the hearing.

114.    The Motion asked for the dismissal of the charges related to the female teacher as it was not tied to a Section 1122 offense.

115.    On January 3, 2021, the Board met to vote on moving forward with the charges, which were framed as categorically seeking dismissal, as opposed to dismissal and/or discipline.

116.    This Motion was not acted on and the Statement of Charge was published on the UBCTS Web Site as an attachment to the agenda of the January 3, 2022 meeting.

117.    Plaintiff's name was not redacted.

118.    In the agenda defendants implied that Plaintiff had engaged in an extramarital sexual affair with a married female teacher.

119.    Further, two members of the public were given permission to speak on them in the public discussion portion of the Meeting.

120.    The implication of an affair is defamation per se.

121.    The matter subsequently was the subject of a devasting and one-sided news article in the Allentown Courier, the major paper in Bucks County.

122.    The published Statement of Charges, and reference to Mr. Sweda became the talk of the UBCTS among teachers and students and the Upper Bucks community.

123.    The allegations in the Statement of Charges were the topic of web-oriented pod casts and blogs.

124.    A Section 1122 dismissal hearing in serial fashion on six separate evenings over the next several months.

125.   At the first hearing, the Board would subsequently entertain Plaintiff's Motion and deny his request for pay and benefits during the pendency of the hearing.

126.   On April 7, 2022, the Board's decision was announced and Sweda was terminated in an 8-1 vote, with the dissenting vote being former Board Chair Hallowell.

127.   On April 20, 2022, Plaintiff received a written determination from the Board via certified mail.

128.   In the determination, the Board ruled in favor of Plaintiff on the arguably most serious allegation, he stole a tank of gas three years before the investigation.

129.   Other charges were not pursued as a basis for determination, and in particular, the allegation that he was not candid about his relationship with a female teacher.

130.   On May 3, 2022, Plaintiff took a de novo appeal to the Secretary of the Department of Education under Section 1131 of the School Code, 24 Pa.C.S. section 1131.

131.   Plaintiff asserts in his appeal that the section 1122 charges are false, trivial or picayune, and do not rise to the level of a Section 1122 termination, and are a pretext for the protected activity described in this Complaint.

132.   In the appeal, he has also complained failure to issue Findings of Fact that reflects the evidence.

133.   He also asserts due process violations, and in particular:

   a.  the publication of the Statement of Charges with Mr. Sweda's name on it as an attachment to an agenda at a public meeting where public comment was taken after he invoked a private right to a hearing under section 1126;

   b.  the failure to follow Pennsylvania law that required payment of salary and benefits during the pendency of the completion of the hearing, or

alternatively, to vote on whether they constituted "serious charges" such that
pay and benefits could be suspended;

c.  the issuance of a determination where the conduct clearly does not rise to the
level of the provisions of Section 1122.

134.   The actions of UBCTS and its attorneys caused Plaintiff distress, humiliation, and
pain and suffering, including the illegal publication of his Statement of Charges even though
Plaintiff asked for a Private Hearing under Section 1126 of the School Code, 24 Pa.C.S. section
11-1126.

135.   The "Pennridge option" mask exemption is an unlawful attempt to evade the law
and compromised or potentially compromised UBCTS' funding for Covid-19 and waived
immunities from suit given to governmental entities, elected officials and LEA administrators
and employees by Pennsylvania law.  Defendants engaged in a fraudulent scheme to allow
parents of children who had no valid medical basis for a mask exemption to nevertheless claim a
medical exemption because if defendants had honestly described their policy as parental choice,
regardless of medical necessity, defendants knew that they would have lost significant federal
funding.

136.   Alternatively, at the time of the activity in this Complaint, given the evolving
situation regarding Covid-19, it was the authoritative position that the "Pennridge option" mask
exemption was a crime and an unlawful attempt to evade the law,  and it furthermore
compromised or potentially compromised UBCTS' funding for Covid-19 given the authoritative
directions from federal and state authorities, statutes, regulations and code and waived
immunities from suit given to governmental entities, elected officials and LEA administrators
and employees by Pennsylvania law.

137.   The Pennsylvania Whistleblower Law prohibits a public body from retaliation because for an employee who reveals waste or wrongdoing.

138.   The Whistleblower Protection Law prohibits an employer from firing an employee who makes a good faith report of waste or wrongdoing. §1423.

139.   Plaintiff reported in good faith waste and wrongdoing to the PDE, members of the JOC, and the public at large.

140.   "Waste" is defined as an employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

141.   "Wrongdoing" is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." §1422.

142.   Plaintiff reported to the PDE the JOC's illegal conduct.

143.   Plaintiff reported to the JOC its conduct violated statute and relevant law.

144.   Plaintiff reported to the public that the JOC's vote mask policy violated statute and relevant law.

145.   There is no requirement in the Whistleblower Protection Law that the activity of the public body or employee doing alleged wrongdoing or waste conceal their action.

146.   Federal funding is based on adherence to the ARP ESSER regulations and the SEA, namely the PDE, was responsible for monitoring and overseeing by regulation the expenditure of federal funds.

147.     In Pennsylvania, a plaintiff may bring a common law wrongful discharge claim where the termination of an employee would threaten clear mandates of public policy.

148.     "Public policy" is not limited to that which has been legislatively enacted but extends to a policy so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regards to it.

149.     Broadly speaking, the public policy tort falls into four categories: (1) an employer cannot require an employee to commit a crime, (2) an employer cannot prevent an employee from complying with a statutorily imposed duty, (3) an employer cannot discharge an employee when specifically prohibited from doing so by statute, and (4) an employer cannot retaliate against an employee because the employee exercised statutory and/or constitutional rights.

150.     The evaluation of whether Pennsylvania Public Policy is violated at the time Plaintiff and UBCTS undertook the activity herein and not done retroactively after the law is clarified by courts of law.

151.     The JOC by its position required UBCTS employees, including Plaintiff, to commit a crime, and Plaintiff properly opposed it.

152.     The JOC terminated Plaintiff as Executive Director from complying with a statutorily imposed duty.

153.     The JOC discharged Plaintiff when specifically prohibited from doing so by statute, section 1122 of the School Code, as a result of his foregoing activity on pretextual reasons.

154.     The JOC retaliated against Plaintiff because he exercised statutory and/or constitutional rights.

155.    Alternatively, the Secretary of Health Order in in the Covid-19 pandemic is a novel and crucial assertion of Pennsylvania Public Policy and was a controlling directive that Plaintiff and other Pennsylvania School Administrators were required to adhere to and advise their Boards and Joint Operating Commissions, and Defendant UBCTS violated Public Policy by terminating Plaintiff because of his protected activity in seeking to clarify UBCTS' responsibilities from the PDE and otherwise firing him for protected activity.

156.    It violates public policy for Defendant UBCTS to fire Plaintiff for advising UBCTS that the law, including the Disease and Control Prevention Act, is violated by its conduct, that a crime was being engaged in under said Act, that it was breaching CDC and PDE mandate, it was risking the waiver of immunity under section 8550 because of alleged willful misconduct, and/or that it put federal funding at risk by its conduct, including but not limited to ARP ESSER funding.

157.    Plaintiff has sustained damages as a result of the termination and retaliation, including lost wages, lost benefits, pain, suffering, humiliation, and loss of reputation.

158.    The termination and conduct herein were actions in disregard to Pennsylvania public policy that prohibits firing someone for compliance with relevant law.

159.    The state law conduct herein rose to the level of punitive damages was intentional, wanton, and committed with reckless indifference to the rights of the Plaintiff, that qualifies for punitive damages.

160.    In regards to federal rights, Defendants conduct rose of the level of punitive damages and was motivated by evil motive or intent, or it involved reckless or callous indifference to the federally protected rights of others."

161.    The injunctive relief sought is (1) reimbursement of Plaintiff to his former position and (2) order UBCTS to pay Plaintiff his back pay and benefits deprived during the pendency of this Section 1122 termination proceeding; and (3) Defendant Banis-Clemens not to engage in future harassment of Plaintiff.

162.    The Declaratory Relief sought is for the Court to declare: (1) Mr. Sweda's Section 1122 proceedings needed to be conducted in accordance with Section 1122 and that UBCTS's findings did not rise to the level of any Section 1122 conduct; (2) the UBCTS violated Mr. Sweda's Section 1122 right to a private hearing; (3) that UBCTS violated Mr. Sweda's right to receive pay or benefits pending the outcome of his Section 1122 termination proceeding; and (4) Defendant Banis-Clemens engaged in unlawful retaliatory treatment of Plaintiff.

163.    Plaintiff demands in excess of $150,000, the jurisdictional limits of federal court.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7)  other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

### COUNT I
### JOHN SWEDA v. DEFENDANT UPPER BUCKS COUNTY TECHNICAL SCHOOL
### 42 U.S.C. § 1983 – FIRST AMENDMENT DISCRIMINATION
### BASED ON POLITICAL BELIEFS AND ASSOCIATION

164.    Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

165.    During the COVID-19 pandemic, the issue of whether state and federal government authorities had the power to compel citizens to comply with safety measures such as masks, isolation, distancing and vaccinations became a hot button political issue.  In some parts of the country political factions formed, regardless of pollical party, around the members' beliefs on these issues.

166.    Defendant Banis-Clemens is the leader of a political faction in Bucks County which sought voter support based, in part, on opposition to state and federal COVID-19 mandates.  Banis-Clemens and her "No Mandate" faction argued that as a political matter, parents and not government authorities should decide what disease mitigation methods should apply to their children, including wearing masks at school and receiving vaccinations.

167.    Plaintiff had the right under the First Amendment to reject the political beliefs of the "No Mandate" faction and to refuse to be associated with that faction.

168.    In 2021 Banis-Clemens and other member of her anti-authority faction perceived that Plaintiff was not a member of their faction and did not share their political beliefs regarding allowing parents to opt out of state and federal mask mandates (and other safety measures) for children in school.

169.    Based on Plaintiff's difference of political opinion with the "No Mandate" faction, Defendants decided to invent fictional reasons to suspend and terminate Plaintiff's employment.

170.    Defendant's actions against Plaintiff violated plaintiff's First Amendment right to reject his employer's political beliefs and associations.

171.    The JOC and UBCTS  ratified the actions of School Board Chair Banis-Clemens as described herein.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT II
## JOHN SWEDA v. DEFENDANT UPPER BUCKS COUNTY TECHNICAL SCHOOL
## 42 U.S.C. § 1983 – FIRST AMENDMENT DISCRIMINATION
## BASED ON PROTECTED SPEECH

172.    Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

173.    Plaintiff had the right under the First Amendment to speak out on matters of public concern, including matters affecting the school where he worked.

174.    Plaintiff spoke out about his belief that the law required the JOC to adopt a Plan which complied with the recommendations of the CDC and the orders of the Pennsylvania Secretary of Health, both at meetings of the JOC and in communications with the Pennsylvania Department of Education and others.

175.    In speaking out in favor of complying with state and federal mask mandates for students, Plaintiff was voicing his concerns as a citizen. Plaintiff's comments on state and federal mask mandates were protected speech under the First Amendment.

176.    Defendant punished Plaintiff for voicing his opinion on compliance with state and federal mask mandates by inventing fictional reasons to suspend and terminate Plaintiff's employment.

177.    The JOC and UBCTS  ratified the actions of School Board Chair Banis-Clemens as described herein.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7)  other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT III

**JOHN SWEDA v. DEFENDANT UPPER BUCKS COUNTY TECHNICAL SCHOOL**

**42 U.S.C. § 1983 –DEPRIVATION OF DUE PROCESS**
**SUBSTANTIVE PROPERTY INTEREST UNDER THE STATUTORY PROVISIONS OF THE SCHOOL CODE OF 1949 IN CONTINUED EMPLOYMENT USING SECTION 1122 PROVISIONS, A RIGHT TO A PRIVATE HEARING UNDER SECTION 1126, AND THEN RIGHT TO RECEIVE PAY AND BENEFITS DURING THE PENDENCY OF A TERMINATION PROCEEDING**

178.    Paragraphs 1 to 175 are incorporated by reference as if set forth herein.

179.    Plaintiff has a property right under the state and federal Constitutions in continued employment and reputation.

180.    Plaintiff's employment right flows in particular from the School Code, where the legislature intended to protect tenure except for the serious charges listed in Section 1122.

181.   The Broad purpose of Section 1122 is to give the greatest amount of protection possible against the dismissal of a professional employee.

182.   Section 1122 was not meant nor intended to provide a school district with an arsenal of weapons to use when it wishes to relieve itself of its contractual obligations to a professional employee.

183.   The statutory provisions for dismissal must be strictly followed and no material deviation therefrom is permissible.

184.   A deviation from the statutory procedures is a denial of due process

185.   Defendant UBCTS deprived Plaintiff of due process by issuing a determination where any alleged offenses did not rise to section 1122 criteria.

186.   Defendant UBCTS possessed under Section 1126 of the School Code a substantive right to choose a private hearing.

187.   Plaintiff properly invoked that right.

188.   Defendant UBCTS deprived Plaintiff of due process by failing to give him a private hearing under section 1126 of the School Code, including but not limited to publishing the Statement of Charges on the internet at a public meeting on January 3, 2022, and taking public comment at that meeting.

189.   Plaintiff had a substantive right to receive pay and benefits during the pendency of a Section 1122 termination proceeding unless the charges are "serious" under the School Code.

190.   Defendant UBCTS deprived Plaintiff of due process by failing to pay him and provide him benefits pending the outcome of the Section 1122 termination proceeding.

191.   Defendant UCTS' violation of procedures is a material deprivation of his entitlements in the termination procedures in the School Code.

192.    Defendant's procedure violations prejudiced his ability to have a fair hearing and/or otherwise caused him harm.

193.    The JOC perpetrated or ratified all due process violations described herein.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; ; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7)  other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

**COUNT IV**

**JOHN SWEDA v. DEFENDANT UPPER BUCKS COOUNTY TECHNICAL SCHOOL PENNSYLVANIA WHISTLEBLOWER LAW**

194.    Paragraphs 1 to 191 are incorporated by reference as if set forth herein.

195.    The Pennsylvania Whistleblower Law  defines a "public body" as "[a] State officer, agency, department, division, bureau, board, commission, council, authority or other body in the executive branch of State government ... [or] any other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body." 43 Pa. Stat. Ann. § 1422.

196.    Defendant UBCTS is a "public body."

197.    The feeder districts, Pennridge, Palisades, and Quakertown, are also public bodies.

198.    The Pennsylvania Whistleblower Law prohibits a public body from retaliation because for an employee who reveals waste or wrongdoing.

27

199.   The Whistleblower Protection Law prohibits an employer from firing an employee who makes a good faith report of waste or wrongdoing. § 1423.

200.   Plaintiff reported in good faith waste and wrongdoing to the PDE, the Board, and the public at large.

201.   "Waste" is defined as an employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

202.   "Wrongdoing" is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." § 1422.

203.   Under Pennsylvania's Whistleblower Law, violations need not be concealed to constitute "wrongdoing."

204.   Plaintiff reported Defendant to the Pennsylvania Department of Education for its proposed policy of violating CDC and PDE mandates.

205.   Plaintiff reported to the JOC that the conduct involves here risked federal and state funding at that it was violative of statute and relevant law.

206.   Plaintiff disclosed this conduct to the public.

207.   Defendant UBCTS engaged in wrongdoing or waste within the meaning of the Pennsylvania Whistleblower Law.

208.   An employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

209.   Plaintiff by the conduct herein reported such wrongdoing or waste to the JOC and to the public at large.

210.   Plaintiff engaged in protected activity.

211.   Defendant UBCTS began investigating Plaintiff for trivial reasons shortly after he engaged in protected activity.

212.   There is a causal link between the protected activity and the termination of employment and loss of Plaintiff's job.

213.   Plaintiff has suffered damages.

214.   Defendant UBCTS caused Plaintiff damages by its conduct, including lost wages, lost benefits, and damages for his pain, suffering, and humiliation.

215.   Plaintiff is eligible also for reinstatement to his position, reinstatement of fringe benefits and time he would have accrued as towards pension and other benefits, other damages actually sustained and the costs of litigation, including a reasonable attorneys' fee and witness fees.

216.   The Pennsylvania Whistleblower Law also provides damages to harm to a whistleblower's reputation, humiliation, and mental anguish.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7)  other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

**COUNT V**

**JOHM SWEDA v. DEFENDANT UPPER BUCKS COUNTY TECHNICAL SCHOOL**

**WRONGFUL DISCHARGE IN VIOLATION OF**

**PENNSYLVANIA PUBLIC POLICY (The Disease and Prevention Control Law of 1955)**

217.    Plaintiff incorporates paragraphs 1 through 214 as if set forth more fully herein.

218.    Violation of the Disease and Prevention Control Law of 1955 is a crime in Pennsylvania.

219.    Violation of the Disease and Prevention Control Law of 1955 is a statutorily imposed duty.

220.    State authorities alerted Plaintiff to this statutorily imposed duty and criminal offense.

221.    Plaintiff engaged in protected activity and a statutorily imposed duty by the conduct in this case.

222.    Defendant UBCTS began investigating Plaintiff for trivial reasons shortly after he engaged in protected activity.

223.    Defendant UBCTS fired Plaintiff for reasons well below Section 1122 reasons for termination of a school professional as a result of his conduct.

224.    There is a causal link between the protected activity and the termination of employment and loss of Plaintiff's job.

225.    Plaintiff has suffered damages.

226.    Defendant UBCTS caused Plaintiff damages by its conduct, including lost wages, lost benefits, and damages for his pain, suffering, humiliation, and loss of reputation.

227.   Defendant UBCTS is subject to punitive damages.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring and being made whole in years of service; (3) punitive damages; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (6)  other costs of the action; (7) interest; and (8) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT VI

### JOHN SWEDA v. DEFENDANT UPPER BUCKS COUNTY TECHNICAL SCHOOL
### WRONGFUL DISCHARGE IN VIOLATION OF
### PENNSYLVANIA PUBLIC POLICY (Secretary of Health's Order)

228.   Plaintiff incorporates paragraphs 1 through 225 as if set forth more fully herein.

229.   It violates public policy in Pennsylvania that a school profession or administrator be fired for recommending to a government body adherence to the Secretary of Health's Order requiring the wearing of masks in school and instructing elected officials on the legal, liability, and safety implications of their inappropriate actions.

230.   The Secretary of Health's Order regarding the Covid-19 pandemic is public policy in Pennsylvania unless and until reviewed and reversed by a court of law.

231.   Defendant UBCTS terminated Plaintiff for pretextual reasons that do not rise to a Section 1122 provision in retaliation for the conduct described herein.

232.   It violated public policy for the JOC to fire Plaintiff for providing a recommendation to follow CDC and PDE guidelines regarding Covid-19.

233.   It violates public policy in Pennsylvania to terminate or retaliate against a school administrator for the perception that the administrator is "pro mask."

234.   Alternatively, it is illegal to terminate or retaliate against an employee for perceived political or ideological reasons related to Covid-19 and the mask mandated.

235.   Plaintiff engaged in protected activity.

236.   Defendant UBCTS began investigating Plaintiff for trivial reasons shortly after he engaged in protected activity.

237.   There is a causal link between the protected activity and the termination of employment and loss of Plaintiff's job.

238.   Plaintiff has suffered damages.

239.   Defendant UBCTS caused Plaintiff damages by its conduct, including lost wages, lost benefits, and damages for his pain, suffering, humiliation, and loss of reputation.

240.   Defendant UBCTS is subject to punitive damages.

WHEREFORE, Plaintiff demands the following relief:   (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring and being made whole in years of service; (3) punitive damages; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (6)  other costs of the action; (7) interest; and (8) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT VI

### JOHN SWEDA v. DEFENDANT UPPER BUCKS TECHNICAL SCHOOL

### WRONGFUL DISCHARGE IN VIOLATION OF

### PENNSYLVANIA PUBLIC POLICY (Section 1122 of the School Code)

241.   Plaintiff incorporates paragraphs 1 through 238 as if set forth more fully herein.

242.   There is a statute regulating when a professional school employee can be fired under the School Code.

243.   Section 1122 of the School Code provides the exclusive reasons a tenured administrator can be terminated in Pennsylvania;

244.   It violates public policy in Pennsylvania that a school profession or administrator be fired for pretextual reasons in this case.

245.   It is the public policy of this Commonwealth that administrators be protected when they recommending to a government body adherence in a pandemic to the Secretary of Health's Order requiring the wearing of masks in school in that the health and safety of not only student and children at UBCTS is at stake, but the spread of the pandemic in the community at large.

246.   Section 1122 offers protection for Administrators doing their duty from retaliation.

247.   Section 1122 does not permit School Board members to retaliation against administrators for ideological, partisan or political reasons.

248.   The charges made by UBCTS do not rise to section 1122 level and are pretexts to fire Plaintiff.

249.   It violates public policy in Pennsylvania to terminate or retaliate against a school administrator for the perception that the administrator is "pro mask."

250. It violated public policy for  the JOC to fire Plaintiff for providing a recommendation  to follow CDC and PDE guidelines regarding Covid-19.

251.   Alternatively, it is illegal to terminate or retaliate against an employee for perceived ideological, partisan, or political reasons related to Covid-19 and the mask mandated.

252.   Plaintiff engaged in protected activity under Pennsylvania public policy.

253.   Defendant began investigating Plaintiff for trivial reasons shortly after he engaged in protected activity.

254.   There is a causal link between the protected activity and the termination of employment and loss of Plaintiff's job.

255.   Plaintiff's protected activity was the reason for his termination.

256.   Plaintiff has suffered damages.

257.   Defendant UBCTS caused Plaintiff damages by its conduct, including lost wages, lost benefits, and damages for his pain, suffering, humiliation, and loss of reputation.

258.   Defendant UBCTS is subject to punitive damages.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring and being made whole in years of service; (3) punitive damages; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (6)  other costs of the action; (7) interest; and (8) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

**COUNT VII**

**JOHN SWEDA v. DEFENDANT MEGAN BANIS-CLEMENS**
**42 U.S.C. § 1983 – FIRST AMENDMENT DISCRIMINATION**
**BASED ON POLITICAL BELIEFS AND ASSOCIATION**

260.     Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

261.     During the COVID-19 pandemic, the issue of whether state and federal government authorities had the power to compel citizens to comply with safety measures such as masks, isolation, distancing and vaccinations became a hot button political issue.  In some parts of the country political factions formed, regardless of pollical party, around the members' beliefs on these issues.

262.     Defendant Banis-Clemens is the leader of a political faction in Bucks County which sought voter support based, in part, on opposition to state and federal COVID-19 mandates.  Banis-Clemens and her "No Mandate" faction argued that as a political matter, parents and not government authorities should decide what disease mitigation methods should apply to their children, including wearing masks at school and receiving vaccinations.

263.     Plaintiff had the right under the First Amendment to reject the political beliefs of the "No Mandate" faction and to refuse to be associated with that faction.

264.     In 2021 Banis-Clemens and other member of her anti-authority faction perceived that Plaintiff was not a member of their faction and did not share their political beliefs regarding allowing parents to opt out of state and federal mask mandates (and other safety measures) for children in school.

265.    Based on Plaintiff's difference of political opinion with the "No Mandate" faction, Defendant Megan Banis-Clemens decided to invent fictional reasons to suspend and terminate Plaintiff's employment.

266.    Defendant's actions against Plaintiff violated plaintiff's First Amendment right to reject his employer's political beliefs and associations.

267.    The JOC and UBCTS  ratified the actions of School Board Chair Banis-Clemens as described herein.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7)  other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

**COUNT VIII**

**JOHN SWEDA v. DEFENDANT MEGAN BANIS-CLEMENS**
**42 U.S.C. § 1983 – FIRST AMENDMENT DISCRIMINATION**
**BASED ON PROTECTED SPEECH**

268.    Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

269.    Plaintiff had the right under the First Amendment to speak out on matters of public concern, including matters affecting the school where he worked.

270.    Plaintiff spoke out about his belief that the law required the JOC to adopt a Plan which complied with the recommendations of the CDC and the orders of the Pennsylvania

Secretary of Health, both at meetings of the JOC and in communications with the Pennsylvania Department of Education and others.

271.    In speaking out in favor of complying with state and federal mask mandates for students, Plaintiff was voicing his concerns as a citizen.  Plaintiff's comments on state and federal mask mandates were protected speech under the First Amendment.

272.    Defendant Megan Banis-Clemens punished Plaintiff for voicing his opinion on compliance with state and federal mask mandates by inventing fictional reasons to suspend and terminate Plaintiff's employment.

273.    The JOC and UBCTS  ratified the actions of School Board Chair Banis-Clemens as described herein.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7)  other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT IX

### JOHN SWEDA v. DEFENDANT MEGAN BANIS-CLEMENS

### 42 U.S.C. § 1983 –DEPRIVATION OF DUE PROCESS
### SUBSTANTIVE PROPERTY INTEREST UNDER THE STATUTORY PROVISIONS OF THE SCHOOL CODE OF 1949 IN CONTINUED EMPLOYMENT USING SECTION 1122 PROVISIONS, A RIGHT TO A PRIVATE HEARING UNDER SECTION 1126, AND THEN RIGHT TO RECEIVE PAY AND BENEFITS DURING THE PENDENCY OF A TERMINATION PROCEEDING

274.   Paragraphs 1 to 175 are incorporated by reference as if set forth herein.

275.   Plaintiff has a property right under the state and federal Constitutions in continued employment and reputation.

276.   Plaintiff's employment right flows in particular from the School Code, where the legislature intended to protect tenure except for the serious charges listed in Section 1122.

277.   The Broad purpose of Section 1122 is to give the greatest amount of protection possible against the dismissal of a professional employee.

278.   Section 1122 was not meant nor intended to provide a school district with an arsenal of weapons to use when it wishes to relieve itself of its contractual obligations to a professional employee.

279.   The statutory provisions for dismissal must be strictly followed and no material deviation therefrom is permissible.

280.   A deviation from the statutory procedures is a denial of due process

281.   Defendant UBCTS deprived Plaintiff of due process by issuing a determination where any alleged offenses did not rise to section 1122 criteria.

282.   Defendant UBCTS possessed under Section 1126 of the School Code a substantive right to choose a private hearing.

283.   Plaintiff properly invoked that right.

284.   Defendant UBCTS deprived Plaintiff of due process by failing to give him a private hearing under section 1126 of the School Code, including but not limited to publishing the Statement of Charges on the internet at a public meeting on January 3, 2022, and taking public comment at that meeting.

285.   Plaintiff had a substantive right to receive pay and benefits during the pendency of a Section 1122 termination proceeding unless the charges are "serious" under the School Code.

286.   Defendant UBCTS deprived Plaintiff of due process by failing to pay him and provide him benefits pending the outcome of the Section 1122 termination proceeding.

287.   Defendant UCTS' violation of procedures is a material deprivation of his entitlements in the termination procedures in the School Code.

288.   Defendant's procedure violations prejudiced his ability to have a fair hearing and/or otherwise caused him harm.

289.   Defendant Megan Banis-Clemens instigated the substantive and procedural due process violations.

290.   The JOC perpetrated or ratified all due process violations described herein.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; ; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7)  other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT X

## JOHN SWEDA v. DEFENDANT MEGAN BANIS-CLEMENS

## PENNSYLVANIA WHISTLEBLOWER LAW

291.   Paragraphs 1 to 191 are incorporated by reference as if set forth herein.

292.   The Pennsylvania Whistleblower Law defines a "public body" as "[a] State officer, agency, department, division, bureau, board, commission, council, authority or other body in the executive branch of State government ... [or] any other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body." 43 Pa. Stat. Ann. § 1422.

293.   Defendant UBCTS is a "public body."

294.   The feeder districts, Pennridge, Palisades, and Quakertown, are also public bodies.

295.   The Pennsylvania Whistleblower Law prohibits a public body from retaliation because for an employee who reveals waste or wrongdoing.

296.   The Whistleblower Protection Law prohibits an employer from firing an employee who makes a good faith report of waste or wrongdoing. § 1423.

297.   Plaintiff reported in good faith waste and wrongdoing to the PDE, the Board, and the public at large.

298.   "Waste" is defined as an employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

299.   "Wrongdoing" is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or

regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." § 1422.

300.   Under Pennsylvania's Whistleblower Law, violations need not be concealed to constitute "wrongdoing."

301.   Plaintiff reported Defendant to the Pennsylvania Department of Education for its proposed policy of violating CDC and PDE mandates.

302.   Plaintiff reported to the JOC that the conduct involves here risked federal and state funding at that it was violative of statute and relevant law.

303.   Plaintiff disclosed this conduct to the public.

304.   Defendant Megan Banis-Clemens engaged in wrongdoing or waste within the meaning of the Pennsylvania Whistleblower Law.

305.   An employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

306.   Plaintiff by the conduct herein reported such wrongdoing or waste to the JOC and to the public at large.

307.   Plaintiff engaged in protected activity.

308.   Defendant Megan Banis-Clemens began investigating Plaintiff for trivial reasons shortly after he engaged in protected activity.

309.   There is a causal link between the protected activity and the termination of employment and loss of Plaintiff's job.

310.   Plaintiff has suffered damages.

311. Defendant Megan Banis-Clemens caused Plaintiff damages by its conduct, including lost wages, lost benefits, and damages for his pain, suffering, and humiliation.

312. Plaintiff is eligible also for reinstatement to his position, reinstatement of fringe benefits and time he would have accrued as towards pension and other benefits, other damages actually sustained and the costs of litigation, including a reasonable attorneys' fee and witness fees.

313. The Pennsylvania Whistleblower Law also provides damages to harm to a whistleblower's reputation, humiliation, and mental anguish.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) declaratory and/or injunctive relief; (3) equitable relief such as rehiring and being made whole in years of service; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) damages for pain, suffering, humiliation, emotional distress, and loss of reputation; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

Respectfully submitted,

WUSINICH, SWEENEY & RYAN, LLC

Date: 5/9/22

BY: _____
Edward C. Sweeney
I.D. No. 64565
M. Frances Ryan
I.D. No. 62060
102 Pickering Way, Suite 403
Exton, PA 19341
(610) 594-1600
esweeney@wspalaw.com
Validation of signature code: ECS1942
*Attorneys for Plaintiff*

42