**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN JEFFREY SWEDA,** : | |
| : | **CIVIL ACTION** |
| *Plaintiff,* : | |
| : | |
| **v.** : | **No. 22-1787** |
| : | |
| **UPPER BUCKS COUNTY TECHNICAL** : | |
| **SCHOOL,** : | |
| : | |
| *Defendant* : | |

## <u>MEMORANDUM OPINION</u>

**Goldberg, J.**                                                    **June 3, 2025**

Defendant, the Upper Bucks County Technical School ("UBCTS") moves for the entry of summary judgment regarding claims brought by its former employee, Plaintiff John Jeffrey Sweda. According to Sweda, he was denied due process under the Fourteenth Amendment, and was unlawfully terminated in retaliation for exercising his First Amendment rights and in violation of public policy under Pennsylvania common law.

For the reasons set forth below, Defendant's motion will be granted in part and denied in part. There is sufficient evidence to warrant submission of Plaintiff's First Amendment claims to a jury, however, judgment shall be entered in Defendant's favor on his federal procedural due process and state law wrongful termination claims.

1

## I.    FACTUAL AND PROCEDURAL HISTORY[1]

This case arose in the late summer and Fall of 2021 in the aftermath of the COVID-19 pandemic.  Plaintiff Sweda had been employed as the Administrative Director of the UBCTS since July 2018, responsible for overseeing the secondary (high school) and adult education programs and all related staff.   (Pl.'s Am. Compl., ¶ ¶ 8-9; Def.'s Ans., ¶¶ 8-9).  UBCTS is run by a Joint Operating Committee (JOC), which functions as the equivalent of a School Board.  (Am. Compl., ¶¶ 5-6; Def.'s Ans., ¶¶ 5-6).  The JOC is comprised of nine members selected from the school boards of the three "sending" school districts – Quakertown, Pennridge, and Palisades.  (Id.; Def.'s Mot. for Summ. J., Ex. G (Dep. of John Jeffrey Sweda), 119).  Sweda reported directly to whichever of the three sending School District Superintendents was serving as the "Superintendent of Record" in a given year.[2]  For the three years prior to his termination, Sweda's job performance was rated good overall, he met all of the goals that had been set for him, received regular salary increases, and his initial three-year employment contract was renewed for another three years in July of 2021.  (Am. Compl., ¶¶ 14-16; Ans., ¶ 14; O'Connell Dep., 38-39, 45; Pl.'s Resp. in Opp. to Def.'s Mot. Summ. J., Ex. (Dep. of William Harner, 79-80)).

Pursuant to federal regulations governing the re-opening and operation of schools during the COVID-19 pandemic in the Fall of 2021, UBCTS was required to and did develop a health and safety plan which would align with the most up-to-date directives and guidance from the Bucks County and Pennsylvania Health Departments and the Centers for Disease Control.  (Am. Compl.,

---

[1]    The facts recited are taken from the Plaintiff's Amended Complaint, the Defendant's Answer, and the exhibits and deposition transcripts provided in support of and in opposition to Defendant's Motion for Summary Judgment.

[2]    Every two years, the Superintendent of Record for the UBCTS rotated from one of the Quakertown, Pennridge and Palisades School District Superintendents to another.  (Am. Compl., ¶ 9; Def.'s Ans., ¶ 9; Def.'s Mot. for Summ. J., Ex. K (Dep. of Bridget O'Connell, 30-32)).

¶ ¶ 26, 29-30; Harner Dep., 80; Sweda Dep., 97-99)).  In mid-August 2021, Sweda sent a letter to the families of all UBCTS students advising that, in line with the then-current guidance, the school would be reopened in the fall with mask-optional attendance.  However, several days after Sweda's letter was sent and in apparent response to then-increasing positive COVID case counts, the guidance changed to require masking in schools.  As a result, Sweda updated the UBCTS health and safety plan and sent a revised letter to students and their families informing them that as of August 30, 2021, masks would be required to be worn in UBCTS.  (Am. Compl., ¶¶ 32-35; Def.'s Mot. for Summ. J., Ex. I (Dep. of Megan Banis-Clements, 140-141, 143-146); Pl.'s Resp. in Opp. to Mot. for Summ. J., Ex. F (Sweda Sworn Declaration, ¶¶ 7-8)).

Notwithstanding the information and guidance issued by the local, state and federal health authorities, on August 19, 2021, in a public meeting, the JOC voted to reject the school's updated health plan mandating the wearing of masks and instead elected to follow a policy previously adopted by the Pennridge School District allowing parents to exempt their children from the mask requirements by signing an exemption form stating their child had a  health condition that justified their not wearing a mask.  Under this policy, which became colloquially known as the "Pennridge Option," no doctor's note or other medical documentation was necessary to invoke the masking exemption.  (Am. Compl., ¶¶ 35-38; Sweda Dep., 145-150; Sweda Decl., ¶¶ 9-12; Banis-Clements Dep., 146-159, 168-170, 172-179).  On September 4, 2021, Pennridge School Board member and then-Vice Chair of the JOC, Megan Banis-Clemens, ordered Sweda to send a letter to the school community stating that it was then the UBCTS policy to allow parents to decide whether their children should wear masks or face shields in school, and clarifying that students who did not mask could not be removed from school.  (Am. Compl., ¶ 51; Def.'s Mot. for Summ. J., Ex. J (Dep. of Chris  Spear), 91-95, 98-99; Banis-Clements Dep., 179-186; 193-200; Sweda Dep., 123-125).

After trying but failing to persuade the JOC to change its position and only after receiving advice from the JOC solicitor that Ms. Banis-Clemens' letter could issue if five or more members of the Board agreed, Sweda sent her letter in early September 2021. (Sweda Dep., 126-131; Banis-Clemens Dep., 176-182, 222-227, 234-238; Sweda Decl., ¶ 38).

Concerned that the JOC's actions were in violation of the law and could harm vulnerable UBCTS students and faculty and jeopardize the school's federal and state funding, Sweda contacted the Pennsylvania Department of Education seeking clarification on whether the JOC could approve a policy whereby the parents could sign a waiver of the mask requirement without providing medical documentation. (Am. Compl., ¶ 49; Harner Dep., 80-81, 121-122; Sweda Dep., 171-172). Sweda's actions greatly upset Ms. Banis-Clemens. (Am. Compl., ¶ 50; Sweda Dep. 172-173; Banis-Clemens Dep., 182-186; Spear Dep., 75-76).

Shortly thereafter, on or about September 12, 2021, Sweda received a communication from Sherri L. Smith, the Acting Deputy Secretary of the Pennsylvania Department of Education addressed to all Pennsylvania school administrators addressing what appeared to be significant non-compliance with the masking requirements in both public and non-public schools. Acting Deputy Secretary Smith's letter clarified that the Pennsylvania Department of Education's recent order "was not a mask optional policy," and that "any school entity simply permitting a parent's sign-off without evidence that the student has a medical or mental health condition or disability that precludes the wearing of a face covering is not in compliance." (Sweda Dep., 161-167; Harner Dep., 119-122). On September 16, 2021, at the regularly-scheduled JOC Board meeting, Sweda submitted a letter to the Board in which he outlined the substance of Smith's communication and what he believed could be the legal and other consequences of not following a mandatory mask policy and urging the JOC to reject the so-called "Pennridge Option." (Sweda Decl., ¶¶ 35-36).

Nevertheless, the JOC in a 6-3 vote, re-affirmed the Pennridge Option, and permitted parents to sign-off that their children should not wear masks without requiring them to produce medical evidence to support their exemptions.  (Banis-Clemens Dep., 244-246; Sweda Dep., 171-172; Sweda Decl.,¶¶ 37).

Although Sweda himself had recruited and hired William Gerhard to the position of Building and Grounds Supervisor at UBCTS prior to COVID, as early as August of 2020, he began finding problems with Gerhard's job performance.  (Sweda Dep., 176-180).  As a result of these performance deficiencies, Gerhard was placed into a progressive discipline process under the guidance of the UBCTS solicitor and its HR director.  (Id., 181-183).  In early September 2021, Sweda began to consider demoting and/or suspending Gerhard, and he brought Gerhard's job performance problems to the attention of the JOC in executive session at the meeting on September 16, 2021.  (Id.).  A few weeks later, Sweda informed Gerhard of his possible demotion/suspension. Gerhard responded by becoming very angry and, after lashing out and swearing at Sweda, he then proceeded to take two weeks off from the job using his accrued sick time.  (Id., 184-187; Sweda Decl., ¶¶ 43-45).

At or around this same time – several weeks after the September 16, 2021 executive and regular JOC meetings – Banis-Clemens informed Sweda that the JOC had decided to conduct confidential interviews of all of UBCTS's employees, beginning with the distribution of a survey by the (Bucks County) Intermediate Unit.  The intended purpose of the interviews and when they took place is unclear, but Banis-Clements informed Sweda that participation was not voluntary. (Banis-Clemens Dep., 269, 271-274, 278).  Although he believed the interviews would prove disruptive to the school's operations, Sweda responded by agreeing to send out the IU survey to UBCTS employees.  (Sweda Decl., ¶ 41).

On November 8, 2021, Gerhard voluntarily resigned from his position.  In addition to his letter of resignation, Gerhard  sent a letter to the JOC complaining about and making numerous accusations of wrongdoing against Sweda.  (Am. Compl., ¶ 94; Ans., ¶ 94; Sweda Decl., ¶¶ 42).  Although the JOC had reason to question Gerhard's motives and the veracity of his allegations having had knowledge of the personnel issues between he and Sweda, the JOC nevertheless placed Sweda on immediate administrative suspension and retained the Pennridge School District's solicitor to investigate Gerhard's accusations.  (Am. Compl., ¶¶ 98-99; Ans. ¶ 98-99; Sweda Decl., ¶¶ 45-47, 57;  Banis-Clemens Dep., 286-290; O'Connell Dep., 87).  At the time of Sweda's suspension, Dr. Bridget O'Connell, the Palisades School District Superintendent, was serving as the Superintendent of Record for the UBCTS and was Sweda's supervisor.  Under the School's Operating Policy No. 828, the Superintendent of Record was charged with the duty of initiating investigations into complaints against the Administrative Director. (Sweda Decl., ¶ 49).  O'Connell,  however, was not consulted by any member of the JOC before the decision was made to suspend Sweda and retain the Pennridge solicitor, nor had she been made aware that the JOC had previously decided to have every teacher in the Technical School interviewed.  (O'Connell Dep., 86-91; Sweda Decl., ¶ 50-52).

The investigation into Gerhard's claims lasted some five weeks, during which time the August 31, 2021 Order requiring masks was vacated by the Pennsylvania Commonwealth Court, and Banis-Clemens replaced James Hallowell as Chair of the JOC.  (Banis-Clemens Dep., 291-295; Am. Compl., ¶ 101; Ans., ¶ 101).  In late December 2021, the JOC concluded its investigation and sent Sweda a "Statement of Charges" in anticipation of terminating him from his position.  Sweda's pay and benefits were also suspended at that time. (Am. Compl., ¶¶ 112, 114; Ans. ¶ 112; Sweda Decl., ¶ 59).  Sweda filed a motion to reinstate his pay and benefits and requested a private

hearing under the Pennsylvania Public School Code.  (Am. Compl., ¶¶ 115-117; Ans. ¶ 115-117; Sweda Decl., ¶¶ 59-61).  In disregard of Sweda's request, the JOC met publicly in early January 2022 and voted to proceed to a termination hearing and published its Statement of Charges on its website.  (Am. Compl., ¶¶ 115-120; Ans. ¶¶ 115-120; Banis-Clemens Dep., 314-317; Sweda Decl., ¶ 62; Def.'s Mot. for Summ. J., Ex. B).  No alternative outcomes were considered and the meeting lasted approximately one-half hour.  Between January and April of 2022, the JOC held six separate hearings on the subject of Sweda's termination, culminating in the JOC's 8-1 vote on April 7, 2022 to terminate his employment on all nine charges.[3]  (Def.'s Mot. for Summ. J., Ex. C).

Sweda filed this civil action on May 9, 2022 and also appealed his termination to the Secretary of Education, which upheld the JOC's decision on the sole ground of Sweda's intemperate use of profane or abusive language.  (Banis-Clemens Dep., 319-318; Def.'s Mot. for Summ. J., Ex. D).  Sweda filed a further appeal to the Pennsylvania Commonwealth Court which affirmed on May 20, 2024, agreeing with the Secretary of Education's determination that Sweda's use of profane or abusive language in violation of the School's Policy #317 "constituted the persistent and willful violation of school laws under Section 1122 of the School Code, 24 P.S. § 11-1122."  (Def.'s Mot. for Summ. J., Ex. E).  The UBCTS moved for summary judgment in this case on July 22, 2024.

## II.    LEGAL STANDARDS

---

[3]    The charges against Sweda concerned the purchase and use of a school log splitter, awarding of a contract for spray cleaning services, and Sweda's alleged failure to submit a competitive grant application on time, using gas from the school's gas pump for his private vehicle, disabling of an external security camera and moving of a picnic table, having an extra-marital dalliance with one of the school's female teachers, and his "intemperance" or swearing at other teachers and staff members.

7

Under Federal Rule of Civil Procedure 56(a),  "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense on which summary judgment is sought."  The motion shall be granted and judgment entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.  "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Stone v. Troy Construction, LLC, 935 F.3d 141, 148, n. 6 (3d Cir. 2019) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Salazar-Limon v. City of Houston, 137 S. Ct. 1277, 1280 (2017) (quoting Anderson, 477 U.S. at 249).  To ascertain whether a genuine issue of material fact exists, the Court must review the record as a whole.  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000).  "The issue of material fact required . . . to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence."  Anderson, 477 U.S. at 248-249. "[R]ather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Id. at 249 (internal citation omitted).  While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  And, in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in that party's favor.  Tolan v. Cotton, 572 U.S. 650, 651 (2016) (per curiam); Scott v. Harris, 550 U.S. 372, 378, (2007).  "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues."

Stewart v. Rutgers, State Univ., 120 F.3d 426, 431 (3d Cir. 1997) (internal citation omitted). "Finally, where the First Amendment is involved," courts "undertake exacting review of the entire record with a particularly close focus on facts that are determinative of a constitutional right." Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (internal quotation marks and citations omitted).

## III.    DISCUSSION

Previously, I partially granted UBCTS's Rule 12(b)(6) motion to dismiss and dismissed Sweda's claims against Megan Banis-Clemens, his claims under the Pennsylvania Whistleblower Law, 43 P.S. § 1422, and two of his wrongful termination claims with prejudice.  Left in place were Sweda's § 1983 First Amendment Discrimination/Retaliation and Fourteenth Amendment Deprivation of Due Process claims in Counts I, II, and III of the Amended Complaint, and his wrongful termination claim under Pennsylvania state law in Count VII.  UBCTS now moves for the entry of summary judgment in its favor on all four of the remaining counts.

### A.    *Plaintiff's § 1983 Claims*

By its clear language, the purpose of 42 U.S.C. § 1983 is to provide a cause of action against "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives another of a federal constitutional or statutory right.  To succeed on a claim under § 1983 and establish liability thereunder, a plaintiff must therefore demonstrate that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, causing the injury complained of.  Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation

of a constitutional right at all.'" <u>Chavarriaga v. N.J. Dep't of Corr.</u>, 806 F.3d 210, 222 (3d Cir. 2015) (quoting <u>Nicini v. Mora</u>, 212 F.3d 798, 806 (3d Cir. 2000)).

Sweda asserts that during the COVID-19 pandemic, the issue of whether state and federal governmental authorities had the power to compel citizens to comply with safety measures like masks, isolation, social distancing, and vaccinations was a "hot button political issue." (Am. Compl., ¶ 165). He claims his termination violated his rights to freedom of speech and association given that he had a right under the First Amendment to disagree and disassociate with the "No Masking Mandate" faction of the JOC and speak out about his concerns that the "Pennridge Option" was in contravention of the then-existing CDC guidance and orders from the Pennsylvania and Bucks County Health Departments. Sweda further alleges his right to due process of law was violated when the JOC met and decided to suspend him without the Superintendent of Record in attendance in violation of School Board Policy 828, and denied his request to expand the hearings to inquire into the retaliatory motives of several of its members.[4]

    1.    <u>UBCTS' Alleged Violation of Plaintiff's Right to Free Speech</u>

It has been clearly established that a state may not discharge a public employee on a basis that infringes upon the employee's constitutionally protected interest in freedom of speech. <u>Rankin v. McPherson</u>, 483 U.S. 378, 383 (1987) (citing <u>Perry v. Sinderman</u>, 408 U.S. 593, 597 (1972)). Indeed, the Supreme Court has recognized that the protections of the First Amendment extend to

---

[4] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people to peaceably assemble and to petition the Government for a redress of grievances." And Section 1 of the Fourteenth Amendment prohibits "any State" from depriving "any person of life, liberty, or property, without due process of law." The First Amendment applies with equal force to the States through the Fourteenth Amendment. <u>Mills v. Alabama</u>, 384 U.S. 214, 218 (1966).

both teachers and students, "neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'"  Kennedy v. Bremerton Sch. Dist., 597 U.S. 507 527 (2022) (quoting Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506 (1969)).

However, this is not to say that the "speech rights of public school employees are so boundless that they may deliver any message to anyone anytime they wish." Id.  "In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." Id.  Thus, given that the State has an interest as an employer with respect to certain speech by its employees, the courts must "strike a balance between the interests of the employee as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." O'Donnell v. Yanchulis, 875 F.2d 1059, 1060 (3d Cir. 1989) (quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968)).

This balancing typically involves two steps.  The first step requires a threshold inquiry into the nature of the speech at issue.  Kennedy, 597 U.S. at 527.  "If a public employee speaks pursuant to [his] official duties, . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is – for constitutional purposes at least – the government's own speech." Id. (internal quotation marks and citation omitted). However, when an employee "speaks as a citizen addressing a matter of public concern, . . .  the First Amendment may be implicated and [the] courts should proceed to a second step" where they should engage in "a delicate balancing of the competing interests surrounding the speech and the consequences." Id. at 528.

Accordingly, when considering First Amendment retaliation claims such as Sweda presents here, courts "first inquire whether the speech at issue is, in fact, constitutionally protected, and then consider whether the government had an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer." Bradley v. W. Chester Univ. of the Pa. State Sys. of Higher Educ., 880 F.3d 643, 648 (3d Cir. 2018). If the employee shows the speech in question is protected by the First Amendment and the speech was a substantial or motivating factor in the alleged retaliatory action, the burden then shifts to the employer to prove that the same action would have been taken even if the speech had not occurred. Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir. 2014).

It is noteworthy that "speech involves a matter of public concern when, considering the 'content, form, and context of a given statement,' it can 'be fairly considered as relating to any matter of political, social, or other concern to the community . . . disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern.'" Id. at 987 n.5 (quoting Connick v. Myers, 461 U.S. 138, 146, 147-148 (1983) and Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir. 1994)). Speech has also been deemed to deal with matters of public concern when it is a subject of legitimate news interest. Snyder v. Phelps, 562 U.S. 443, 453 (2011). And the fact that the speech concerns information related to or learned through public employment does not automatically strip it of its First Amendment protection – there is considerable value in encouraging, rather than inhibiting speech by public employees given they are often in the best position to know what ails the agencies for which they work. Lane v. Franks, 573 U.S. 228, 236 (2014). In this regard, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." Id. (quoting San Diego v. Roe, 543 U.S. 77, 82 (2004) (per curiam)).

In speaking out about and seeking clarification on the JOC's adoption of the Pennridge option, Sweda may be found to have been speaking on a matter that clearly concerned the public, and in particular, the staff and students of UBCTS and their families.  To be sure, the COVID-19 pandemic was ongoing in the Fall of 2021 and the guidance from the federal, state, and local health authorities was frequently changing.  In submitting a letter to the Department of Education asking for guidance on the legality of the Pennridge Option and presenting his concerns to the JOC at its September 16, 2021 regularly scheduled meeting, Sweda was expressing his fears and health concerns for his students and teaching staff, and stating his belief that allowing parents to exempt their children from wearing masks in the school without providing medical evidence violated the federal, state and local directives requiring masks to be worn.  This is arguably speech protected by the First Amendment.

Further, despite his concerns, it is undisputed that Sweda followed the JOC's directive and implemented the Pennridge Option following the decision to proceed with its adoption.  Nor is there any evidence in the record that communicating with the Pennsylvania Department of Education or seeking health guidance were among the job duties which Sweda regularly performed.  This supports the inference that in his role as the Administrative Director of the technical school, Sweda had no responsibility for setting or making policy decisions.  And given the close proximity in time between the various events which occurred between late August and early November 2021 – including Banis-Clemens' exclamation that Sweda "reported us" – it could also be inferred that Sweda's Department of Education inquiry and expression of his concerns at the September 16, 2021 JOC meeting were substantial or motivating factors in its decisions to begin interviewing all school employees, commence an investigation into Gerhard's allegations without informing the Superintendent in Charge, and ultimately suspend him.  Accordingly, I find

the burden is properly shifted to UBCTS to prove it would have taken the same actions even if Sweda had not spoken out.

Turning to this second part of the equation – whether the same action would have been taken, whether 'adequate justification' existed for treating Sweda differently than the general public based on the school's needs as an employer, and whether Sweda's First Amendment right to speak freely should therefore yield to the school's interests in promoting the efficiency of the public services it performs, UBCTS has offered no evidence or argument. In the absence of such necessary evidence, I find UBCTS has failed to carry its burden of demonstrating the absence of a genuine dispute as to these material facts and that it is entitled to the entry of judgment in its favor as a matter of law. UBCTS's motion for summary judgment is therefore denied as to Count II of the Amended Complaint.

2.    UBCTS' Alleged Violation of Plaintiff's Right to Freedom of Association

Summary judgment is also sought with respect to Count I, in which Sweda claims UBCTS violated his First Amendment right to freedom of association in terminating him.

As the Supreme Court has observed: "if there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act, their faith therein." Elrod v. Burns, 427 U.S. 347, 356-357 (1976) (quoting Board of Education v. Barnette, 319 U.S. 624, 642 (1943)). The fixed star referred to in Elrod is the First Amendment and there is no doubt that it includes the "freedom to associate with others for the common advancement of political beliefs and ideas," or that this freedom is also protected against state infringement by the Fourteenth Amendment. Id. at 357.

In application, the First Amendment generally prohibits government officials from dismissing or demoting an employee because of that employee's actual or believed participation in constitutionally protected political activity. Heffernan v. City of Paterson, N.J., 578 U.S. 266, 268, 273-274 (2016). It is not, however, without limits. "Where it can be shown that party affiliation is an acceptable requirement for some type of government employment or that an employee's private political beliefs would interfere with the discharge of his public duties, his first Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." DeFiore v. Vignola, 835 F. Supp. 249, 251 (E.D. Pa. 1993) (citing Branti v. Finkel, 445 U.S. 507, 517 (1980)). As a consequence, public agencies/entities may not constitutionally discharge employees based on their political affiliation when those employees' positions are neither policymaking nor advisory; in those instances, an employee's First Amendment right outweighs the Government's interest in maintaining a system of political patronage. Goodman v. Pennsylvania Turnpike Comm'n., 293 F.3d 655, 663 (3d Cir. 2002) (citing Elrod, 427 U.S. at 372-373, and Branti, 445 U.S. at 514-515).[5] Moreover, affiliation with a particular political faction or party is not necessary for a discharge on patronage grounds to

---

[5] The test for ascertaining whether a position falls within the definition of "policymaking" is generally one of fact, which requires inquiry into whether an employee (1) has duties that are non-discretionary or non-technical, (2) participates in discussions or other meetings, (3) prepares budgets, (4) possesses the authority to hire and fire other employees, (5) has a high salary, (6) retains power over others, and (7) can speak in the name of policymakers. Minor v. River, 70 F.4th 168, 176 (3d Cir. 2023). Although there is no evidence in this record with regard to Sweda's salary or the extent to which he participates in the preparation of budgets, retains power over others, or can speak in the name of policymakers, it does appear that he participates in some JOC and other meetings, but does not have any non-discretionary/non-technical duties. Given that he could only recommend Gerhard's termination, he obviously also does not have the authority to unilaterally hire and fire. All in all, I find this evidence militates in favor of the conclusion that Sweda's position was neither policymaking nor advisory. Accordingly, his First Amendment rights outweigh any interests which the JOC may have had in requiring him to align politically with its members.

be actionable.  "Freedom of association . . . plainly presupposes a freedom not to associate," and "is as protected as the right to associate."  Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984); Galli, 490 F.3d at 274;  Bennis v. Gable, 823 F.2d 723, 731 (3d Cir. 1987); Christy v. Pa. Turnpike Comm'n, 904 F. Supp. 427, 430 (E.D. Pa. 1995).

To make out a *prima facie* case of discrimination based on political patronage in violation of the First Amendment, a plaintiff must show that (1) he was employed at a public agency in a position that does not require political affiliation, (2) he was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision.  Galli, 490 F.3d at 271.  Once this demonstration has been made, the defendant employer may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity.  Id.  (internal quotation marks and citation omitted).

By its own admission in its Memorandum of Law in Support of its Motion for Summary Judgment: "[t]he Upper Bucks County Technical School is a public entity that does not require its [e]mployees to have a particular political affiliation, association or belief."  (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., 3, ECF No. 34-16).  By this statement, the first part of the three-part test articulated in Galli has been satisfied.

UBCTS next argues Sweda "must establish that an unofficial political affiliation requirement existed, [and] he must define that affiliation."  Id.  Two types of association are protected under the First Amendment: expressive and intimate.  Roberts v. Mentzer, 382 F. App'x 158, 163 (3d Cir. 2010).  Expressive association protects the right of individuals "to gather and/or associate in order to pursue political, social, economic, educational, religious, and cultural ends," and "[i]ntimate association protects the closest and most interdependent of human relationships

against state interference." Id. An association that seeks to transmit a system of values is said to be engaging in expressive activity. Boy Scouts of Am. v. Dale, 530 U.S. 640, 650 (2000). Here, Sweda argues UBCTS has recognized "[i]t is his political association with others whose stance was similar on masking exemptions that Plaintiff believes is protected under the First Amendment." (Def.'s SJ Memorandum, at 4).

As was observed by the Third Circuit,

> In the wake of the COVID-19 pandemic, federal, state, and local governments scrambled to implement policies to control the spread of the disease . . . which included mandates to wear face masks in public indoor spaces such as schools, . . . [and] spawned skepticism and debate. Some objectors voiced their discontent online, some turned to their elected representatives, and some asked the courts to intervene. Others took less trodden paths.

Falcone v. Dickstein, 92 F.4th 193, 197 (3d Cir. 2024). See also, Amalgamated Transit Union Local 85 v. Port Authority of Allegheny County, 39 F.4th 95, 103-104 (3d Cir. 2022) ("Port Authority's mask rules restrict speech on matters of public concern."); Doe v. Salina, Civ. No. 23-3529, 2024 U.S. Dist. LEXIS 224362 *1, n.1, *64 (E.D. N.Y. Dec. 11, 2024) (noting that "throughout the pandemic, masks in the classroom has emerged as a highly contentious issue" and that "COVID-19 mask mandates spawned a fertile ground of litigation," but acknowledging plaintiff had a First Amendment right to express her viewpoints "regarding the mask mandate and other political topics.").

As the foregoing reflects, mask rules were matters of public concern, and it was not uncommon for sides to be chosen on the matter of masking during the pandemic. UBCTS argues that Sweda "has failed to produce evidence to show that a 'No Mandate' faction existed within the JOC at UBCTS," and "has therefore also failed to produce evidence to show Plaintiff's rejection of the 'No Mandate' faction." (Id. at 5). But this argument is belied by the deposition testimony, emails, and other evidence in the record. Indeed, this evidence shows a clear difference of opinion

existed between Megan Banis-Clemens and Chris Spear and the five other JOC members (Kern, Reiss, Mitchell, Cormack and Ott) who agreed to the adoption of the Pennridge Option on the one hand, and the other JOC members (Hallowell, Ochmanowicz, and Freeman), school superintendents (O'Connell, Harner, and Bolton), and solicitors from the JOC and the three sending school districts on the other. These latter JOC members, solicitors and superintendents either disagreed or did not wholly agree with Banis-Clemens' reading of the information and guidance from the federal, state and local health authorities and the Pennsylvania Department of Education that medical documentation need not accompany a parental waiver. Insofar as Sweda likewise disagreed with the interpretation that medical proof of a qualifying disability was not necessary, a jury could well find he was engaged in constitutionally-protected associational conduct in refusing to associate with the JOC's "No Mask faction." Thus, the second part of the three-part Galli test has been sufficiently shown to warrant denial of UBCTS' motion.

Turning to the third Galli prong – that the conduct was a substantial or motivating factor in the employment decision – I also find the record contains enough evidence to merit submission to a jury. Again, within weeks of the JOC's informal and then formal adoption of the Pennridge Option on September 3 and September 16, 2021 and Banis-Clemens learning of Sweda's inquiry to the Pennsylvania Department of Education, a jury could conclude that the decision to begin interviewing all faculty and staff would be, as Sweda testified, disruptive to the school's operations. Thereafter, immediately upon receipt of Gerhard's accusations on November 8th, and without consulting or providing any notice to Sweda's supervisor, the JOC decided to suspend him.

As I previously noted in my Memorandum Opinion of August 18, 2023 disposing of UBCTS's motion to dismiss, "[s]uggestive timing or temporal proximity can indicate a causal link

between protected conduct and an allegedly retaliatory action," and "circumstantial evidence, such as a pattern of antagonism, may allow an inference of causation" to be drawn. (Mem. Op. Aug. 18, 2023, 14, ECF No. 23). While the timing of these events may indeed be nothing more than coincidence, and a jury could find that Sweda would have been terminated anyway for swearing, I find these are matters are best left to a fact finder. And given the presence of evidence that the extent of Sweda's use of profanity, though admitted, was occasional, used behind closed doors and in the context of general conversation among co-workers, I cannot make the factual finding that UBCTS would have terminated him for this reason alone. The motion for summary judgment is therefore also denied as to Count I of the Amended Complaint.

### 3.    Deprivation of Due Process

In Count III, Sweda asserts UBCTS deprived him of his Fourteenth Amendment right to due process of law insofar as it failed to follow the procedures outlined in the School Code of 1949, 24 P.S. § 1-101, *et. seq.* in terminating his employment. Specifically, Sweda submits that the technical school failed to properly terminate his employment under one or more of the grounds enumerated in 24 P.S. §11-1122, and deprived him of the full pay and benefits to which he was entitled under 24 P.S. § 11-1122 pending a final determination on the charges. He also contends he was deprived of the private hearing to which he was entitled upon request pursuant to 24 P.S. § 11-1126.

In relevant part, the Fourteenth Amendment provides that no "State shall deprive any person of life, liberty, or property, without due process of law." When a plaintiff sues under § 1983 for a state actor's failure to provide procedural due process, a "familiar two-stage analysis" is employed "inquiring (1) whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty or property; and (2) whether the procedures

19

available provided the plaintiff with due process of law." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (internal quotation marks and citations omitted).

Turning to the first step – determining whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of life, liberty, or property – Sweda of course, is claiming he had a constitutionally-protected property interest in his employment. But property interests are not created by the Constitution. Board of Regents v. Roth, 408 U.S. 564, 577 (1972). "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. To have a property interest in a job, a person must have more than an abstract need or desire, or a unilateral expectation of continued employment; he must have a legitimate entitlement to it. McKinney v. Univ. of Pittsburgh, 915 F.3d 956, 960 (3d Cir. 2019). Although at-will employees generally do not have a legitimate entitlement to continued employment because they serve solely at the pleasure of their employers, such an entitlement may arise from the circumstances of service or from any such rules or mutually explicit understandings that would support a claim of entitlement. Perry v. Sinderman, 408 U.S. at 601-602; Elmore v. Cleary, 399 F.3d at 282. Here, UBCTS acknowledges that Sweda was not employed at-will, and the record shows he was a contracted public school employee entitled to certain safeguards and procedures under Pennsylvania state law.[6] Accordingly, Sweda had a property interest in his employment which fell within the ambit of the due process protections afforded under the Fourteenth Amendment.

---

[6]    Indeed, 24 P.S. § 11-1122(a) provides as follows in pertinent part:

> The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality; incompetency; unsatisfactory teaching performance based on two (2) consecutive ratings of the employe's

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  I thus now turn to the second part of the § 1983 analysis which requires examination of the processes provided to Sweda to determine whether they were sufficient to meet the standards for due process.

As the Supreme Court reiterated in Loudermill, it is an "essential principle of due process" that a deprivation of life, liberty or property be preceded by notice and opportunity for hearing "appropriate to the nature of the case."  Id. at 542. (internal citation omitted).  "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment."  Id. (quoting Board of Regents v. Roth, 408 U.S. at 569-570 and Perry v. Sinderman, 408 U.S. at 599). Indeed, the "'root requirement'" of the Due Process Clause" has been described "as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."  Id. (emphasis in original). Though necessary, the pretermination "hearing" need not be elaborate, and the formality and procedural requisites for the hearing can vary, "depending upon the importance of the interests involved and the nature of the subsequent proceedings." Id. at 545 (quoting Boddie v. Connecticut,

---

teaching performance that are to include classroom observations not less than four (4) months apart, in which the employe's teaching performance is rated as unsatisfactory; intemperance; cruelty; persistent negligence in the performance of duties; wilful neglect of duties; physical or mental disability as documented by competent medical evidence, which after reasonable accommodation of such disability as required by law substantially interferes with the employe's ability to perform the essential functions of his employment; advocation of or participating in un-American or subversive doctrines; conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; persistent or wilful violation of or failure to comply with school laws of this Commonwealth (including official directives and established policy of the board of directors); on the part of the professional employe; . . .

401 U.S. 371, 378 (1971)).  To be sure, "due process is flexible and calls for such procedural protections as the particular situation demands."  Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ., 574 F.3d 214, 220 (3d Cir. 2009) (quoting Gilbert v. Homar, 520 U.S. 924, 930 (1997)).  Thus, something less than a full evidentiary hearing may be sufficient prior to the taking of an adverse administrative action, so long as the "fundamental" due process requirement of an "opportunity to be heard at a meaningful time and in a meaningful manner" is afforded.  Id.; Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

Under the Pennsylvania School Code, 24 P.S. § 11-1127, the following procedures are outlined for dismissals of professional school employees:

> Before any professional employe having attained a status of permanent tenure is dismissed by the board of school directors, such board of school directors shall furnish such professional employe with a detailed written statement of the charges upon which his or her proposed dismissal is based and shall conduct a hearing.  A written notice signed by the president and attested by the secretary of the board of directors shall be forwarded by registered mail to the professional employe setting forth the time and place when and where the professional employe will be given an opportunity to be heard either in person or by counsel, or both, before the board of school directors and setting forth a detailed statement of the charges.  Such hearing shall not be sooner than ten (10) days nor later than fifteen (15) days after such written notice.  At such hearing all testimony offered, including that of complainants and their witnesses, as well as that of the accused professional employe and his or her witnesses, shall be recorded by a competent disinterested public stenographer whose services shall be furnished by the school district at its expense.  Any such hearing may be postponed, continued or adjourned.

And under § 11-1126, "[a]ll hearings, under the provisions of this article or any other provision of the school laws pertaining to the dismissal or the termination of contracts of professional employes, shall be public, unless otherwise requested by the party against whom the complaint is made."

The record in this case reflects that the JOC immediately administratively suspended Sweda from his executive directorship with pay upon receiving Gerhard's resignation letter in

which he accused Sweda of numerous wrongdoings, and appointed the Pennridge School District solicitor as "special counsel" to investigate the allegations. (Def.'s Mot. for Summ. J., Ex. C). At the conclusion of the investigation, the special counsel prepared a summary of preliminary findings which he sent to Sweda, inviting him to respond. On December 21, 2021, Sweda responded, through his attorney, which special counsel considered a "Loudermill notice," but several days later on December 27, 2021, a draft Statement of Charges was submitted to Bridget O'Connell, the Superintendent of Record, who was Sweda's supervisor. O'Connell recommended approving the charges, and Sweda was placed on unpaid suspension that same day. (Id.) At a special meeting of the JOC on January 3, 2022, the JOC formally approved the Statement of Charges, which were then issued to Sweda and his attorney via Registered Mail, Return Receipt Requested, and Email. At that meeting, which was public and conducted in accordance with Sunshine law requirements, members of the public were able to comment on Sweda's alleged actions. Subsequently, Sweda requested a private hearing on the charges against him, and his request was granted. (Def.'s Mot. for Summ. J., Ex. D). Eventually, the hearing was held over the course of six separate sessions, on January 18 and 31, and February 3, 9, 14 and 25, 2022. On April 7, 2022, the JOC voted to terminate Sweda's employment. (Id., Ex. C). Sweda appealed his termination to the Secretary of Education, who affirmed it only one ground and he appealed to the Pennsylvania Commonwealth Court. Ultimately, that Court affirmed the ruling by the Education Secretary.

I find the foregoing procedures, though not perfectly followed, were adhered to sufficiently to comply with the dictates of §§ 11-1126 and 11-1127 of the School Code. In short, Sweda received all of the process to which he was entitled under Loudermill. See, 470 U.S. at 547. Given these procedures were also more than sufficient to comport with the requirements of the Fourteenth

Amendment, UBCTS is entitled to the entry of judgment in its favor as a matter of law on Count III of the Amended Complaint.

       B.     *State Claim for Wrongful Termination in Violation of Public Policy*

Sweda's final claim, set forth in Count VII, alleges that the reasons given by the JOC for terminating him were in fact pretexts for the true reason – his having spoken out and recommended that UBCTS adhere during the pandemic to the Secretary of Health's order requiring the wearing of masks in school so as to safeguard the health of not only the school community but also the public at large.  He further alleges that part of the policy behind § 11-1122's limitation of the grounds for termination of professional school employees is also to protect them from retaliation for doing their duties.

Sweda was employed pursuant to a contract.  In Pennsylvania, claims for wrongful discharge on the grounds that the termination violated public policy apply only to at-will employees.  See, Ciferni v. Day & Zimmerman, Inc., 529 F. App'x 199, 203 (3d Cir. June 27, 2013) and Coppola v. JNESO Pocono Med. Ctr., 400 F. App'x 683, 684-685 (3d Cir. Nov. 5, 2010) (both citing, *inter alia*, Phillips v. Babcock & Wilcox, 503 A.2d 36 (Pa. Super. Ct. 1986); Ross v. Montour R. Co., 516 A.2d 29, 32 (Pa. Super. Ct. 1986).  This is because terminated employees who are not at-will employees may pursue their claims under breach of contract theories.  Jones v. SEPTA, Civ. No. 12-6582, 2013 U.S. Dist. LEXIS 66615 at *14 (E.D. Pa. May 9, 2013); Engstrom v. John Nuveen & Co., Inc., 668 F. Supp. 953, 959 (E.D. Pa. 1987).  Insofar as Sweda was a contracted employee, his remaining wrongful discharge claim cannot lie and the entry of summary judgment in favor of UBCTS on Count VII of the Amended Complaint is proper.

IV.     **CONCLUSION**

For all of the above-stated reasons, Defendant Upper Bucks County Technical School's Motion for Summary Judgment shall be granted in part and denied in part. Judgment will be entered in favor of Defendant only as a matter of law on Counts III and VII. The Motion is denied in all other respects.

An Order follows.